UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARGEURITA RAY et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0018-X |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

While serving ribs in a facility owned by the United States Department of Veterans Affairs ("the VA"), Margeurita Ray ("Mrs. Ray") tripped over the junction between a power cord and an extension cord and received severe burns. She and her husband, Stephen Ray ("Mr. Ray"), sued the United States. The United States now moves for summary judgment. [Doc. No. 29]. For the reasons below, the Court **GRANTS** the motion and **DISMISSES WITH PREJUDICE** the Rays' claims.

### I. Factual Background

Mr. Ray was the president of Paralyzed Veterans of America ("PVA"), a non-profit entity providing services for veterans with spinal cord injuries. In September 2019, the PVA sponsored its Dallas chapter's annual cookout, where volunteers serve food to veterans. The cookout occurred at a gym in the VA's medical center.

The Rays planned the cookout, brought the food, and brought some equipment. In particular, the Rays brought a serving tray with a heat lamp affixed to it so that Mrs. Ray could keep ribs warm while she sliced them. Mrs. Ray agreed in her

deposition that she placed the lamp on a serving table "where [she] wanted it to be."[1] The lamp's power cord ran under the serving tray, making the tray "a little wobbly."[2] Because the power cord wasn't long enough to reach a power outlet on the wall opposite the serving table, Mrs. Ray asked a VA employee for an extension cord. Using gray duct tape, a VA employee[3] taped the cord "securely to the floor."[4] Mrs. Ray stated in her deposition that she noticed the tape and asked that a VA employee use another piece to secure the lamp's power cord to the table. In addition, a so-called "chafing dish" filled with hot water sat on the table to the left of the heat-lamp assembly.[5] As recreated at Mrs. Ray's deposition, the assembly looked like this:



[6]

---

[1] Doc. No. 31-1 at 32.

[2] Doc. No. 31-1 at 33.  The record doesn't make clear who set up the cord in that manner.

[3] Mrs. Ray says either "VA employee Skylar Fluitt, or VA Volunteer James Robinson" taped the cord.  Doc. No. 34 at 9.  For this motion, the Court assumes a VA employee taped down the cord.

[4] Doc. No. 1 at 4.

[5] Doc. No. 31-1 at 34.

[6] Doc. No. 31-1 at 79.

The tape covered part of the lamp's power cord, the junction between the power cord and the extension cord, and part of the extension cord (collectively "the cord assembly"). That junction stood about 1.5 inches off the floor.[7] The gym's floor was orange, so it contrasted with the gray duct tape. The floor looked like this:

[8]

The cord assembly had been in place for about twenty minutes when lunch began. At some point,[9] Mrs. Ray began serving ribs. Towards the "middle" of the lunch, her "foot tripped over the extension cord plug junction."[10] Mrs. Ray's fall knocked over the chaffing dish, which poured scalding water on her stomach, legs, arm, and back.

The Rays sued under the Federal Tort Claims Act ("FTCA"), bringing claims for premises liability, general negligence, and loss of consortium. The United States now moves for summary judgment.

---

[7] Doc. No. 31-1 at 64. Although the government disputes some of these facts, the Court describes the facts in the light most favorable to the Rays.

[8] Doc. No. 31-1 at 74.

[9] Mrs. Ray provided conflicting answers regarding timing. In her interrogatories, she affirmed that "[w]e began serving luncheon at noon." Doc. No. 31-1 at 63. But in her deposition, she said they began serving food at "[a]bout 1:00 o'clock, 1:15." *Id.* at 34. That discrepancy doesn't matter here since it's undisputed that her fall took place towards the "middle" of the lunch. *Id.* at 36.

[10] Doc. No. 31-1 at 36, 64.

## II. Legal Standard

District courts can grant summary judgment only if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact."[12]

## III. Analysis

The Rays bring claims for (A) premises liability, (B) negligence, and (C) loss of consortium. The Court considers each in turn.

### A. Premises-Liability Claim

Mrs. Ray's premises-liability claim fails because (1) she knew about the cord assembly, (2) the cord's junction was not unreasonably dangerous, and (3) the government exercised ordinary care.

#### 1. Knowledge of the Cord Assembly

The government asserts that Mrs. Ray had "knowledge of the cord assembly."[13] Here's why that matters: A visitor's status on the property—namely whether she is a licensee or an invitee—determines the scope of a landowner's duty to that visitor. A landowner owes "[a] higher standard of care" to an invitee and "a lower standard of

---

[11] FED. R. CIV. PROC. 56(a).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

[13] Doc. No. 32 at 22.

care" to a licensee.[14] Pursuant to that lower standard of care, Texas law requires "a licensee [to] prove that he did not know of the dangerous condition, while an invitee need not do so."[15] Accordingly, the government contends that, as (i) a licensee (ii) with knowledge of the condition, Mrs. Ray's premises-liability claim fails.

### i.  Mrs. Ray Was a Licensee

The threshold question is whether Mrs. Ray was an invitee or a licensee at the VA's facility. That's "a question of law for the court."[16] And, under the FTCA, the Court must apply "the law of the place where the act or omission occurred."[17] Because Mrs. Ray received her injuries in Dallas, the Court looks to Texas law.

An invitee is someone on the land for the "mutual benefit" of the invitee and the landowner.[18] That mutual benefit usually must be "a shared business or economic interest" because "the prospect of pecuniary gain is a sort of quid pro quo for the higher duty of care owed to invitees."[19]

Mrs. Ray's volunteer work didn't provide pecuniary gain to the VA. In fact, as the Texas Supreme Court recently clarified, "a person on property to perform volunteer work for a third party benefits the third party rather than the property owner and therefore is not the owner's invitee."[20] Because Mrs. Ray's volunteer work

---

[14] Richard A. Epstein, *The Roman Law of Cyberconversion*, 2005 MICH. ST. L. REV. 103, 117 (2005).

[15] *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992).

[16] *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209 (Tex. 2015) (cleaned up).

[17] 28 U.S.C. § 1346(b)(1).

[18] *Catholic Diocese of El Paso v. Porter*, 622 S.W.3d 824, 829 (Tex. 2021) (cleaned up).

[19] *Id.* at 829, 832 (cleaned up).

[20] *Id.* at 832.

5

benefitted the PVC—not the VA—she was the VA's licensee. Mrs. Ray raises two objections.

First, she claims that her volunteer activities indirectly inured to the VA's benefit and that an invitee need not "directly provide a pecuniary benefit to the possessor."[21] But her citation for that proposition is an eighty-year-old case that held that "those who enter a shop with no present purpose of buying . . . are business visitors" even though any "benefit to the possessor [is] indirect."[22] She's correct that the required benefit need not be **direct**, but it still must be **pecuniary**.[23]

Second, Mrs. Ray contends that the VA and PVA possess "overlapping and complimentary purposes."[24] Thus, the argument goes, her work provided "an obvious benefit to the VA Hospital itself."[25] But the test is whether Mrs. Ray's presence provided "potential pecuniary profit" to the VA—not whether her presence is consistent with the VA's overarching objectives.[26]

Even assuming, for argument's sake, that the PVA's cookout provided a pecuniary benefit to the VA, Mrs. Ray's argument still fails because it improperly conflates herself with the PVA. For instance, in *Catholic Diocese of El Paso v. Porter*,

---

[21] Doc. No. 34 at 14.

[22] *Carlisle v. J. Weingarten, Inc.*, 152 S.W.2d 1073, 1076 (Tex. 1941) (cleaned up).

[23] *See id.* (recognizing that the presence of a customer with no present intent to purchase still "tend[s] to increase . . . business"). *But see Wickard v. Filburn*, 317 U.S. 111, 128–29 (1942) (in the commerce clause context, growing wheat in your own backyard for your own personal consumption is commerce).

[24] Doc. No. 34 at 14.

[25] *Id.* at 16.

[26] *Porter*, 622 S.W.3d at 830 (cleaned up).

6

622 S.W.3d 824, 828 (Tex. 2021), a 4-H club rented a booth at a church's festival. A lower court determined that there was no meaningful distinction between the 4-H club and its volunteers, that the 4-H club's presence provided pecuniary benefit to the church, and that, by extension, the volunteers' labor "benefit[ted] economically" the church.[27] But the Texas Supreme Court rejected that reasoning, refusing to conflate the 4-H club with its volunteers.[28] Even if the 4-H club provided pecuniary benefit to the church, "none of the proceeds from the volunteers' sales . . . went to the Church."[29] Thus, the volunteers' activities did not economically benefit the church.

Similarly, Mrs. Ray's serving ribs generated no proceeds whatsoever—much less proceeds that went to the VA. Accordingly, even supposing that the PVA's presence provided some pecuniary benefit to the VA, Mrs. Ray's argument improperly conflates herself with the PVA.

Because Mrs. Ray's volunteer work did not provide pecuniary benefit to the VA, she was the VA's licensee—not its invitee.

### ii. Mrs. Ray Knew of the Condition

To make out a premises-liability claim, "a licensee must prove that: (1) a condition of the premises created an unreasonable risk of harm . . . ; (2) the owner actually knew of the condition; (3) the licensee did not actually know of the condition; (4) the owner failed to exercise ordinary care . . . ; (5) the owner's failure was a

---

[27] *Id.* at 831 (cleaned up).
[28] *Id.*
[29] *Id.*

proximate cause of injury to the licensee."[30] The government focuses on element (3), contending that Mrs. Ray knew about the cord assembly.

The government can show knowledge under a subjective or objective standard. Under a subjective standard, "[a] licensee has actual knowledge of [a] condition if the condition was perceptible to [her] or if [s]he could infer its existence from the facts within [her] present or past knowledge."[31] Similarly, under an objective standard, some dangers are objectively "so open and obvious that as a matter of law the plaintiff will be charged with knowledge . . . thereof."[32] To determine whether a condition is open and obvious, courts ask "what a reasonably prudent person would have known under similar circumstances."[33]

Under either standard, Mrs. Ray had actual knowledge of the cord assembly. As a subjective matter, Mrs. Ray conceded in her briefing that "she was aware of the taped cord in the walkway" and admitted during her deposition to "dodging that cord all day."[34] In fact, Mrs. Ray herself requested an extra piece of tape to secure the cord to the table.[35] Likewise, as an objective matter, the cord assembly was open and obvious. As Mrs. Ray conceded during her deposition, "[e]verybody was dodging that

---

[30] *Payne*, 838 S.W.2d at 237.

[31] *Jacobson v. Ron*, No. 01-08-00645-CV, 2009 WL 144992, at *5 (Tex. App.—Houston [1st Dist.] Jan. 22, 2009, pet. denied).

[32] *Ille v. Lowe's Home Centers, LLC*, No. 1:20-CV-143-H, 2021 WL 6063112, at *4 (N.D. Tex. Dec. 20, 2021) (Hendrix, J.) (cleaned up).

[33] *Id.* (cleaned up).

[34] Doc. No. 34 at 18; Doc. No. 31-1 at 101.

[35] Doc. No. 31-1 at 33; *see Allen v. Sherman Operating Co.*, No. 21-40913, 2022 WL 3359273, at *2 (5th Cir. Aug. 15, 2022) (finding knowledge of a cord where a plaintiff "had taken steps to make it safer in the past").

cord" during the lunch.[36] And a fellow volunteer corroborated that claim, noting that the cord "was very obvious and everyone who was serving the food could not avoid seeing the tape over the cord and/or stepping over the taped-down cord."[37] Further, far from camouflaging the cord assembly, the gray duct tape contrasted with the orange gym floor.[38] In short, Mrs. Ray had knowledge of the cord assembly.

Mrs. Ray objects, contending that—even though she was aware of the cord assembly more generally—she didn't know the precise "placement of the junction within the walkway."[39] She thus whittles down the definition of the "condition" at issue, asserting that her knowledge of the cord assembly as a whole is irrelevant so long as she lacked epistemic certainty regarding the junction's location. There are two problems with that argument.

First, it doesn't matter whether Mrs. Ray knew the precise placement of the junction because Texas law only requires knowledge of a condition "as a general matter."[40] Accordingly, courts find the requisite knowledge where plaintiffs know

---

[36] Doc. No. 31-1 at 101.

[37] *Id.* at 95.

[38] *Id.* at 74. Everything contrasts with orange. Perhaps premises liability minded property owners should consider such excellent examples as the orange VA gym and the blue Boise State football field.

[39] Doc. No. 34 at 11.

[40] *Allen v. Sherman Operating Co.*, No. 4:20-CV-290-SDJ-KPJ, 2021 WL 5154221, at *4 (E.D. Tex. July 9, 2021) (emphasis added), *report and recommendation adopted*, No. 4:20-CV-290-SDJ, 2021 WL 5710566 (E.D. Tex. Dec. 2, 2021), *aff'd sub nom. Allen*, 2022 WL 3359273; *see also Allen*, 2022 WL 3359273, at *2 ("Sherman had no duty to warn of or fix a hazard ***generally known*** to . . . Mrs. Allen[.]" (emphasis added)).

9

about the *type* of hazard at issue.⁴¹ And that makes sense: A licensee armed with knowledge of a type of hazard can "take reasonable measures to protect herself."⁴²

Unsurprisingly, then, courts have repeatedly rejected plaintiffs' attempts to cry ignorance to specific, more-dangerous aspects of conditions. For instance, in *Quinones v. Wal-Mart Stores Texas, L.L.C.*, No. 7:17-CV-477, 2018 WL 7253959, at *10 (S.D. Tex. Dec. 27, 2018), the plaintiff slipped somewhere on a sidewalk or curb. The plaintiff knew that the sidewalk was wet but argued that she didn't know that "red paint on [a] curb [was] more slippery than the sidewalk.⁴³ The court rejected that argument, concluding that her failure to appreciate that the red paint was extra slippery "does not negate . . . Plaintiff's awareness of the condition."⁴⁴

Likewise, in *Allen v. Sherman Operating Co.*, No. 21-40913, 2022 WL 3359273, at *2 (5th Cir. Aug. 15, 2022), the plaintiff tripped over a cord. The plaintiff admitted that she "*knew* about the cord and its dangers" but contended that "she didn't know

---

⁴¹ *See, e.g., San Jacinto River Auth. v. Simmons*, 167 S.W.3d 603, 610 (Tex. App.—Beaumont 2005, no pet.) (finding the requisite knowledge where the plaintiff knew of a "slip hazard"); *Allen*, 2021 WL 5154221, at *4 (finding the requisite knowledge where the plaintiff knew of a "tripping hazard[]").

⁴² *Quinones v. Wal-Mart Stores Tex., L.L.C.*, No. 7:17-CV-477, 2018 WL 7253959, at *9 (S.D. Tex. Dec. 27, 2018), *aff'd*, 786 F. App'x 20 (5th Cir. 2019); *see also* RESTATEMENT (SECOND) OF TORTS § 342 cmt. l (2022) (recognizing that a licensee with knowledge "is in a position to make an intelligent choice as to whether the advantage to be gained is sufficient to justify [her] in incurring the risk by entering or remaining").

⁴³ *Quinones*, 2018 WL 7253959, at *7, *10. Although there was some confusion about "what Plaintiff considers the 'condition,'" the court looked to "the combined presence of the powerwashing and surrounding water, curb, and sidewalk." *Id.* at *10.

⁴⁴ *Id.* at *10.

it was there *that day*."⁴⁵ The Fifth Circuit rejected that argument, concluding it was enough that the cord was "generally known" to the plaintiff.⁴⁶

In short, even if Mrs. Ray didn't know about the precise placement of the junction, she knew of the cord assembly and knew "that, as a general matter, cords laying on the ground constitute tripping hazards."⁴⁷ That knowledge enabled Mrs. Ray to "take reasonable measures to protect herself," such as lifting her feet.⁴⁸

Second, Mrs. Ray is deemed to have actual knowledge if "the existence of [the condition] can be inferred from facts within [her] present or past knowledge."⁴⁹ Even supposing, for argument's sake, that Mrs. Ray needed to have knowledge of the junction, the facts within her knowledge were sufficient to warn her of the tripping hazard that the junction posed. Mrs. Ray knew that the lamp's power cord ran down from the table because she asked for tape to secure the cord to the side of the table. She knew that the power cord connected to an extension cord because she requested that set up and saw that the heat lamp had power. She knew that the junction between the power and extension cords fell somewhere between the start of the power cord on the table and the power outlet on the wall since she knew that the lamp's power cord wasn't long enough to reach the wall. Finally, she knew where the cord assembly, more generally, was located on the ground because she had been "dodging

---

⁴⁵ *Allen*, 2022 WL 3359273, at *1–2.

⁴⁶ *Id.* at *2.

⁴⁷ *Allen*, 2021 WL 5154221, at *4.

⁴⁸ *Quinones*, 2018 WL 7253959, at *9.

⁴⁹ *Allen*, 2022 WL 3359273, at *2 (emphasis omitted) (cleaned up).

11

[it] all day."[50] Thus, even if Mrs. Ray didn't have knowledge of the precise location of the junction, the facts within her knowledge were sufficient to warn her that the junction posed a "potential [tripping] hazard."[51]

In a last-ditch effort, Mrs. Ray accuses the government of "blam[ing] the victim" and arguing effectively that "she should not have gotten out of bed on th[at] day."[52] That protest belies a fundamental misunderstanding of the economic theory undergirding premises liability. Here's how premises liability works: While visitors on a piece of property will inevitably sustain injuries from time to time, landowners cannot be "insurer[s] of a visitor's safety."[53] Thus, the law imposes loss-allocation rules that tether the landowner's duty to "the distribution of benefits."[54] If an invitee visits the property for the "mutual benefit" of the landowner, then the owner accepts both that benefit along with a "higher standard of care."[55] Conversely, if a licensee visits the property for a reason that provides no pecuniary benefit to the landowner, then the owner gets no pecuniary benefit but also takes on "a lower standard of care."[56] Thus, the law doesn't suggest that Mrs. Ray "should not have gotten out of bed" that day. But neither does the law transmogrify the government—and, by extension, the American taxpayer—into an insurer merely because Mrs. Ray decided

---

[50] Doc. No. 31-1 at 101.

[51] *Simmons*, 167 S.W.3d at 610.

[52] Doc. No. 34 at 23.

[53] *Austin*, 465 S.W.3d at 203 (cleaned up).

[54] Epstein, *supra* note 14, at 117.

[55] *Id.*

[56] *Id.*

12

to visit the VA that day. Because Mrs. Ray visited the VA as a licensee, the government took on a lesser duty to Mrs. Ray than if she were there to help the VA make money.

In any event, the government's duty to Mrs. Ray evaporated once Mrs. Ray became aware of the cord assembly. A visitor with knowledge of a hazard is best situated to make an "accurate determination of the point up to which changes to avoid accident costs . . . are cheaper than the accident costs which would result without these changes."[57] Thus, the law doesn't engage in "victim blaming" by acknowledging the unremarkable reality that the person who can "better evaluate the risk of accidents" is "the better loss bearer."[58] In short, Mrs. Ray—armed with knowledge of the cord assembly—was best situated to look at that assembly, assess the risk of an accident, and adjust her behavior accordingly—by lifting her feet enough to avoid tripping on the cord assembly.

Because Mrs. Ray knew that the cord assembly posed a tripping hazard, she necessarily loses on her premises-liability claim as a matter of law.

### 2. No Unreasonable Danger

Even assuming, for argument's sake, that the United States owed some duty to Mrs. Ray *vis-à-vis* the cord junction,[59] it would only owe a "duty to make safe or

---

[57] Guido Calabresi, *Fault, Accidents and the Wonderful World of Blum and Kalven*, 75 YALE L.J. 216, 225 (1965).

[58] *Id.*

[59] For purposes of this section, the Court assumes, for argument's sake, that the cord junction is the relevant condition.

13

warn of unreasonably dangerous conditions."[60]  To determine whether a condition is unreasonably dangerous, courts have considered "whether the relevant condition was clearly marked, its size, whether it had previously caused injuries or generated complaints, whether it substantially differed from conditions in the same class of objects, and whether it was naturally occurring."[61]

Four of those factors favor the government.  First, gray duct tape clearly distinguished the cord assembly—including the junction—from the orange gym floor.  Second, the junction stood 1.5 inches high.  It was small.  Third, there's no evidence that the junction previously caused injuries or generated complaints (but this factor only barely favors the government because the cord assembly was for a one-time use).  Fourth, the cord junction's height differed from the cord's height by 1.25 inches—not a substantial difference.

The last factor favors Mrs. Ray, as the junction was not naturally occurring.  But courts have found myriad man-made objects to not be unreasonably dangerous as a matter of law.  For instance, "display stands, hand trucks, raised door thresholds, curbs, and steps . . . have been held not to be unreasonably dangerous."[62]  Likewise, "[a] hose laying on the ground . . . , clearly visible to anyone walking in the vicinity,

---

[60] *Austin*, 465 S.W.3d at 203.

[61] *United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800, 803 (Tex. 2022).

[62] *Smith v. Fed. Cleaning Contractors, Inc.*, 126 F. App'x 672, 674 (5th Cir. 2005).

does not pose an unreasonably dangerous condition."[63] The junction—at 1.5 inches tall—is smaller than a curb, smaller than a step, and similar in size to a hose.

Thus, the cord junction fits squarely within the type of commonplace objects that are not unreasonably dangerous as a matter of law. Accordingly, the Court concludes that the cord assembly, including the junction, was not unreasonably dangerous.

Mrs. Ray provides one counterargument, citing a smorgasbord of safety standards and arguing that the taped-down cord junction violates those standards. That argument fails for three reasons.

First, for safety standards to be helpful, they must be the "*applicable* safety codes."[64] If a plaintiff "fail[s] to submit evidence showing that the safety codes . . . applied to" the premises at issue, then those standards cannot dictate the analysis.[65] Although Mrs. Ray devotes two sentences to arguing that the Americans with Disabilities Act ("ADA") standards apply to the VA's building, she provides no evidence supporting that claim.

Second, only the "*applicable* safety codes" will do.[66] But, as the government rightly points out, most of Mrs. Ray's cited standards "address[] height differentials in the surface of a floor"—not items that are temporarily taped onto the floor.[67] In

---

[63] *Id.*; *cf. Thomas v. Premier Prods., Inc.*, No. 1:10-CV-00334-SA-DAS, 2013 WL 65437, at *5 (N.D. Miss. Jan. 4, 2013) ("[T]he cord upon which Thomas allegedly tripped is markedly similar to the litany of typical hazards that normally fail to constitute an unreasonably dangerous condition.").

[64] *McIntire*, 646 S.W.3d at 804.

[65] *Id.*

[66] *Id.*

[67] Doc. No. 37 at 11.

15

fact, some of the standards expressly distinguish permanent floor features from "one-time use" of electrical cords.[68] Further, none of the cited standards appears to mention cord junctions, so they provide no guidance on the condition at issue.

Third, Mrs. Ray cites two guidelines that "specifically identify cords as a tripping hazard."[69] But nothing in those guidelines suggests that a taped cord junction is unreasonably dangerous. In fact, the CDC and NIOSH guidelines actually say that "[f]or . . . one-time use" of an electrical cord, a company should "tape . . . electrical cords to floors if they cross walkways."[70] Likewise, the CDC and NIOSH guidelines for healthcare workers suggest a variety of "[p]revention [s]trategies" for common hazards like "tap[ing] cords to flooring."[71] In short, the guidelines don't address cord junctions, but they do suggest that taping a cord assembly is a reasonably safe preventative measure.

### 3. The Government Took Reasonable Care

Even assuming, for argument's sake, that Mrs. Ray lacked knowledge of an unreasonably dangerous condition, she still must show that the government "failed to exercise ordinary care to protect [her] from danger."[72] A landowner takes "ordinary

---

[68] Doc. No. 35-1 at 29.

[69] Doc. No. 34 at 22.

[70] Doc. No. 35-1 at 29.

[71] *Slip, Trip, and Fall Prevention for Healthcare Workers*, DEP'T OF HEALTH AND HUMAN SERVS., https://www.cdc.gov/niosh/docs/2011-123/pdfs/2011-123.pdf (last visited Jan. 4, 2023).

[72] *Payne*, 838 S.W.2d at 237.

16

care" when it "warn[s] the plaintiff or mak[es] the premises reasonably safe."[73] Here, the government did both.

First, the government provided an adequate warning. The gray duct tape covering the cord junction contrasted with the orange gym floor. In fact, Mrs. Ray's preferred CDC and NIOSH guidelines agree that "high contrast" colored materials, including "tape," "provide a cue of a change in elevation."[74] And, as Mrs. Ray admits, the warning worked: The tape caught Mrs. Ray's eye, providing her notice that she should "dodg[e] th[e] cord."[75] In short, the tape didn't conceal the junction—it accentuated the junction.

Mrs. Ray counters that, because the junction stood 1.25 inches higher than the rest of the cord, the tape effectively "conceal[ed]" the junction.[76] But she cites no case holding that a landowner must provide a separate warning for every portion of a condition with a new elevation. In fact, the Texas Supreme Court has suggested the opposite, concluding that a high contrast paint "indicate[d] a change in elevation" even where that paint coated the "edges" of a four-inch-tall ramp along with "the parking space next to the ramp."[77] In short, a warning need not alert a licensee to the precise nature of the condition—it only must convey that caution is in order.

---

[73] *State v. Williams*, 940 S.W.2d 583, 584 (Tex. 1996) (per curiam).

[74] *Slip, Trip, and Fall Prevention for Healthcare Workers*, DEP'T OF HEALTH AND HUMAN SERVS., https://www.cdc.gov/niosh/docs/2011-123/pdfs/2011-123.pdf (last visited Jan. 4, 2023); *cf. Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 163 (Tex. 2007) (recognizing that "yellow stripping . . . is a common method used to indicate a change in elevation").

[75] Doc. No. 34 at 18; Doc. No. 31-1 at 101.

[76] Doc. No. 34 at 23.

[77] *See Alger*, 228 S.W.3d at 162–63.

Second, a VA employee made the junction reasonably safe by "duct-tap[ing] [it] securely to the floor."[78]  As Mrs. Ray's preferred guidelines demonstrate, "[f]or . . . one-time use" of an extension cord, a company should "tape . . . electrical cords to floors."[79]  Although Mrs. Ray contends that the VA employee could have made the assembly safer by taping "the junction . . . under the table,"[80] her post-hoc proposal of a superior design is "no evidence that" the earlier design "was dangerous."[81]

### B. General-Negligence Claim

The Rays now agree that "the facts . . . do not support a claim for negligent activity."[82]  Accordingly, the Court **DISMISSES** the Rays's general-negligence claim.

### C. Loss-of-Consortium Claim

Mr. Ray also brings a claim for loss of consortium.  "A cause of action for loss of consortium is derivative of the" principal cause of action.[83]  Because Mrs. Ray's premises-liability claim fails, her husband's loss-of-consortium claim likewise fails.

The Court **GRANTS** the government's motion as to Mr. Ray's loss-of-consortium claim.

---

[78] Doc. No. 1 at 4.

[79] Doc. No. 35-1 at 29.

[80] Doc. No. 34 at 23.

[81] *City of Dall. v. Thompson*, 210 S.W.3d 601, 604 (Tex. 2006) ("Here, there is evidence that additional screws had been added to other coverplates, but there was no evidence that a coverplate without the additional screw was dangerous when properly tightened.").

[82] Doc. No. 34 at 24.

[83] *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990).

## IV. Conclusion

The Court **GRANTS** the government's motion for summary judgment. The Court **DISMISSES WITH PREJUDICE** the plaintiffs' claims.

**IT IS SO ORDERED** this 9th day of January, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE